**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JANET PAEZ,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>NANCY A. BERRYHILL, Acting<br>Commissioner of Social Security,<br><br>　　　　Defendant. | Case No.  CV 16-09148-RAO<br><br><br>**MEMORANDUM OPINION AND ORDER** |

## I.　INTRODUCTION

Plaintiff Janet Paez ("Plaintiff") challenges the Commissioner's denial of her application for a period of disability, disability insurance benefits ("DIB"), and supplemental security income ("SSI").  For the reasons stated below, the decision of the Commissioner is REVERSED and REMANDED.

## II.　PROCEEDINGS BELOW

On July 5, 2011, Plaintiff protectively applied for SSI alleging disability beginning August 24, 2008.  (Administrative Record ("AR") 127, 140, 179-80.) Her application was denied initially on November 29, 2011, and upon reconsideration on May 22, 2012.  (AR 207, 215.)  On June 23, 2012, Plaintiff filed

a written request for hearing, and a hearing was held on April 15, 2013. (AR 40, 221.) Represented by counsel, Plaintiff appeared and testified, along with an impartial vocational expert ("VE"). (AR 40-74.) On May 3, 2013, the Administrative Law Judge ("ALJ") found that Plaintiff had not been under a disability, pursuant to the Social Security Act,[1] since August 24, 2008. (AR 195.) The Appeals Council remanded the case for further consideration, and another hearing was held on March 23, 2015. (AR 75, 201-05.) Plaintiff again appeared and testified, along with her mother and an impartial VE. (AR 75-126.) On May 22, 2015, the ALJ again found that Plaintiff had not been under a disability, pursuant to the Social Security Act, from August 24, 2008 through the date of decision. (AR 32.) Plaintiff filed this action on December 9, 2016. (Dkt. No. 1.)

The ALJ followed a five-step sequential evaluation process to assess whether Plaintiff was disabled under the Social Security Act. *Lester v. Chater*, 81 F.3d 821, 828 n.5 (9th Cir. 1995). At **step one**, the ALJ found that Plaintiff had not engaged in substantial gainful activity since August 24, 2008, the alleged onset date ("AOD"). (AR 22.) At **step two**, the ALJ found that Plaintiff has the following severe impairments: migraine headaches, recurrent kidney stones, and cervicalgia. (*Id*.) At **step three**, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (AR 27.)

Before proceeding to step four, the ALJ found that Plaintiff has the residual functional capacity ("RFC") to:

> [P]erform light work . . . except the claimant has no limitation in her ability to sit, stand, or walk. She can lift or carry up to 20 pounds frequently and 10 pounds occasionally. She can occasionally climb stairs or ramps, balance, stoop, kneel, crouch, and crawl. She is

---

[1] Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment expected to result in death, or which has lasted or is expected to last for a continuous period of at least 12 months. 42 U.S.C. § 423(d)(1)(A).

precluded from climbing ladders, ropes, or scaffolding. She is limited to occasional reaching with the right upper extremity.

(*Id.*)

At **step four**, based on Plaintiff's RFC and the VE's testimony, the ALJ found that Plaintiff was capable of performing past relevant work as a sales representative, customer service representative, and check cashing clerk, and therefore the ALJ did not proceed to step five. (AR 31.) Accordingly, the ALJ determined that Plaintiff has not been under a disability from the AOD through the date of the decision. (AR 32.)

## III. <u>STANDARD OF REVIEW</u>

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. A court must affirm an ALJ's findings of fact if they are supported by substantial evidence and if the proper legal standards were applied. *Mayes v. Massanari*, 276 F.3d 453, 458-59 (9th Cir. 2001). "'Substantial evidence' means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citing *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). An ALJ can satisfy the substantial evidence requirement "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (citation omitted).

"[T]he Commissioner's decision cannot be affirmed simply by isolating a specific quantum of supporting evidence. Rather, a court must consider the record as a whole, weighing both evidence that supports and evidence that detracts from the Secretary's conclusion." *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001) (citations and internal quotation marks omitted). "'Where evidence is susceptible to more than one rational interpretation,' the ALJ's decision should be upheld." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citing

*Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005)); *see Robbins,* 466 F.3d at 882 ("If the evidence can support either affirming or reversing the ALJ's conclusion, we may not substitute our judgment for that of the ALJ."). The Court may review only "the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (citing *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003)).

## IV.   DISCUSSION

Plaintiff raises the following issues for review: (1) whether the ALJ properly rejected the opinions of Plaintiff's treating, examining, and non-examining doctors; (2) whether the ALJ properly assessed Plaintiff's RFC and her ability to perform past relevant work; (3) whether the ALJ properly assessed third-party testimony; and (4) whether the ALJ properly discredited Plaintiff's testimony. (JS 3.) Plaintiff contends that the ALJ failed to properly assess the medical opinions, failed to include all of Plaintiff's limitations in the RFC, failed to assess the credibility of third-party testimony, and failed to provide clear and convincing reasons for discrediting Plaintiff's testimony. (JS 4, 33-34, 49-50, 51-52.) The Commissioner disagrees. (JS 15, 41, 43, 50-53.) For the reasons below, the Court agrees with Plaintiff regarding the assessment of the medical opinion evidence and remands on that ground.

### A.     The ALJ's Credibility Determination Is Supported By Substantial Evidence[2]

Plaintiff argues that the ALJ failed to provide clear and convincing reasons to reject Plaintiff's testimony. (JS 53.) The Commissioner argues that the ALJ's credibility findings are supported by substantial evidence. (JS 57.)

---

[2] The ALJ determined that some opinion evidence was based on Plaintiff's discredited subjective allegations, and the ALJ accordingly assigned those opinions less weight. Therefore, the Court addresses the issue of Plaintiff's credibility first.

4

### 1. Plaintiff's Testimony

Plaintiff testified that she was laid off from work in April 2008 after she had been on short-term disability due to stress and kidney stones. (AR 81, 86.) Plaintiff testified that she "loved working" and "wanted to be back working." (AR 86.) When she tried to go back to work, she was informed that they were phasing out her department, and she was offered a position on the loading dock. (*Id.*) Because Plaintiff "wasn't even able to work that even on [her] best day," she resigned. (*Id.*) Plaintiff then collected unemployment benefits for "as long as [she] could," about two years. (AR 81.) While she was on unemployment, Plaintiff had "a lot of medical problems going on at the same time too." (AR 82.) Plaintiff testified that she had to let the unemployment office know that she was looking for work, but after going on a couple of interviews, she did not think that she would be able to do the things required at those jobs. (*Id.*) She continued to look for work similar to what she had been doing before, but she was not able to do the required lifting. (AR 84.)

Plaintiff testified that her right shoulder prevents her from lifting, and she has numbness down her arm. (*Id.*) Plaintiff drops things a lot and cannot 10-key like she used to. (*Id.*) After Plaintiff told her doctor that she was having pain in her chest, she was told that she had a herniated disc in her neck. (*Id.*) Plaintiff had an MRI performed in the past year that revealed changes in her cervical spine; she had waited almost six years for the MRI due to insurance reasons. (AR 84-85.) Plaintiff stated that she has a "type II acromion type shoulder" that prevents her from being able to lift in an up-and-down motion. (AR 84.) Plaintiff cannot lift cases of water at the grocery store, hold a case of soda, carry a gallon of milk, or bear any weight. (AR 84-85.)

Plaintiff testified that she cannot work because she is in pain all day. (AR 87.) Plaintiff's shoulder and neck cause migraines with "radiating," "shooting," and "burn[ing]" pain down her arm. (*Id.*) Plaintiff also has a "grinding type

stabbing pain" in her back and shoulder. (*Id.*) Plaintiff always wears pain patches on her shoulders. (*Id.*)

In the past year and a half, Plaintiff began having problems with her right hip. (*Id.*) Plaintiff explained that it felt like her hip was "popping in two different places," and after the popping, she felt pain in her right hip. (*Id.*) Plaintiff's doctor thought it was bursitis and gave her pain medication, which did not help. (AR 87-88.) Plaintiff now wakes up with shooting pain from the top of her back down to the bottom of her right leg. (AR 88.)

Plaintiff stated that one of her doctors thinks she has fibromyalgia. (*Id.*) Plaintiff is vitamin D deficient and takes a lot of vitamin D supplements every day. (*Id.*) Plaintiff "generally just do[es] not feel good all the time" and is in pain. (*Id.*)

Plaintiff lives with her disabled mother, her adult son, and her teenage daughter. (AR 89.) At the time of the hearing, Plaintiff was not receiving mental health treatment. (*Id.*) Plaintiff saw her therapist two weeks before the hearing, but that was the first time she had gone to therapy since her prior April 2013 hearing. (*Id.*) Plaintiff stated that she had not been going to therapy because her daughter began seeing a doctor at the same facility. (AR 90.) Plaintiff explained that there was a conflict of interest, and she was "going to have to do a direct admit" for her daughter unless she took herself off the doctor's list and substituted her daughter in her place. (AR 104.) Plaintiff currently takes Xanax, which is prescribed by her general physicians. (AR 90.)

Plaintiff testified that during the relevant time period,[3] she had been having four to five migraines per week and went to urgent care or the hospital "probably every other day." (AR 92.) The more severe migraines were related to her shoulder and her neck, and she would get a really bad migraine if her shoulder got

---

[3] Although the ALJ's decision found that Plaintiff was not disabled through the date of decision (AR 32), at the hearing, the ALJ instructed Plaintiff to address the time prior to December 31, 2013, her date last insured (AR 92; *see* AR 21).

really cold or if she had "slept funny." (AR 94.) Plaintiff testified that at that time, she "thought every migraine was as bad as the one before," but looking back on that now, "they weren't as bad." (*Id.*) About two out of four or five migraines at that time were truly bad migraines, and the other ones were due to the residual effects of her pain medications. (*Id.*) During the more severe migraines, Plaintiff went to urgent care for pain shots and nausea medication, then stayed in bed for two or three days. (AR 95.) Plaintiff testified that during these migraines, she would only use the restroom and sleep, and she did not shower. (*Id.*)

After Plaintiff received the May 2013 decision denying her benefits, she read the ALJ's reasoning. (AR 92.) Plaintiff noted that the ALJ had said that Plaintiff's testimony was believable, but the ALJ "looked back to [Plaintiff's] history and saw that [she] had had a lot of pain medication." (*Id.*) Plaintiff started thinking about all the pain shots that she had received. (*Id.*) Instead of going to urgent care to immediately receive a pain shot, she "start[ed] to see if [she] could get through this hour." (*Id.*) When Plaintiff started receiving pain shots less frequently, her migraines became less frequent. (AR 93.) Plaintiff stated that she now knows that her migraines and fogginess came from the Demerol and morphine that she was receiving. (*Id.*) Plaintiff has been controlling everything with her doctor and has not had a pain shot in a year, which is "something that [she's] really proud of." (*Id.*) When Plaintiff read the ALJ's first decision, she "did take that heavy" and reconsidered her viewpoint of, "I need to be here and I'm in pain and you need to give this to me." (*Id.*) Plaintiff realized that she "needed to take hold of it" and be present with her children. (*Id.*) Plaintiff noted that she had been spending more time at urgent care than at home where she could lie down, be comfortable, take her prescribed medications, sleep, and get up feeling better without the drowsiness from the medication. (*Id.*) Plaintiff explained that by doing that instead of getting so many pain shots, her migraines started getting better. (AR 95.)

///

Plaintiff now has about two to four migraines per month, and they are not as bad as they used to be. (AR 90.) Plaintiff attributed two migraines per month to her shoulder and neck pain, and one or two to her menstrual period. (AR 96.) Plaintiff then stated that she currently has about two migraines per week. (AR 97.) Plaintiff explained that, due to the stress of the hearing, she had more migraines than usual during the previous month. (*Id.*) Plaintiff explained that in November, she had three or four migraines, in December, she had about two migraines, and in January, she had no migraines. (*Id.*) Plaintiff stated that on average, she has two to six migraines per month, and during a bad migraine, she spends two or three days in bed. (AR 98.) One migraine can cause her to "lay out" for a week, without television or noise. (AR 90.) Plaintiff testified that she gets nauseous and dizzy, and she had fallen twice due to migraines. (*Id.*)

Plaintiff stated that she currently has one kidney stone, but she had not passed one in about six months, "which is good." (AR 91.) Plaintiff has been taking cranberry supplements, which have helped, and she has not been on antibiotics for a year. (*Id.*) Plaintiff cannot lie down when she has kidney stone pain and needs to move around. (*Id.*) When she has kidney stone pain at the same time as her shoulder and back pain, she's "just a crying mess." (*Id.*) Plaintiff will go to the emergency room "if there's something [she] needed to get." (*Id.*) One of Plaintiff's doctors is "really good about diets," and after working with that doctor, "it seems to have gotten better." (*Id.*)

Plaintiff testified that she has difficulty brushing her teeth due to her shoulder pain, and she is not brushing her teeth correctly because of the way she has to hold the brush. (AR 98.) Her right hand gets sore after two minutes, and then she has to use her left hand. (AR 98-99.) Plaintiff cannot hold a pen and write without pain, and her writing "comes out terrible." (AR 99.) Plaintiff cannot wear fastened bras anymore, only sports bras. (*Id.*) Plaintiff also does not wear tied shoes or button-up pants. (*Id.*) All of her clothing is "soft and is able to pull on easy." (*Id.*)

Plaintiff cannot cook or bake anymore; she cannot even use a whisk. (AR 88, 100.) Plaintiff's right hand is also very sensitive to the heat from the oven. (AR 100.) With her right hand, Plaintiff can lift her three-pound Chihuahua from the floor to her bed. (*Id.*)

Plaintiff lies down at home because it hurts to sit after 20 or 30 minutes. (AR 101.) The pain begins in her lower back and moves into her shoulder. (*Id.*) Plaintiff gets a "gnawing, burning pain" under her shoulder blade, and pain medication sometimes does not work. (*Id.*) Plaintiff also has difficulty standing because her shoulder tends to slope down. (*Id.*) Plaintiff testified that walking is as difficult as standing, and she explained that when she took her daughter to the mall, Plaintiff had to sit down within 10 minutes. (AR 101-02.) Plaintiff is not very steady when walking, and her "right leg kind of rounds in when [she] walk[s]." (AR 102.)

Plaintiff testified that before December 2013, she could stand for about 30 minutes. (*Id.*) It was difficult to walk more than two blocks, and she could sit for only 45 minutes. (AR 103.) Plaintiff could carry her rat terrier then, who weighs about five or six pounds. (*Id.*) At that time, when Plaintiff got out of bed, she felt "like [she] had had a bad workout." (AR 102.) Now, when Plaintiff gets out of bed, the balls of her feet hurt. (*Id.*)

Plaintiff stated that she has OCD, which leads her to clean with a toothbrush when she showers, wash her hair three times so that nothing bad happens, and brush her hair 200 times on each side. (AR 105.) Plaintiff avoids everyone and does not like answering her door. (*Id.*) When Plaintiff is around people, her heart runs and she starts to feel sick. (AR 106.) Because she does not drive and needs to depend on someone else to drive her, she "avoid[s] it all together." (*Id.*) Plaintiff has not seen her father, who lives in the same town, in two years. (*Id.*) Plaintiff also did not see her grandmother when she visited the town the prior summer. (*Id.*)

///

9

Plaintiff testified that the last time she left the house by herself was when she was raped in July 2010. (*Id.*)

### 2. Applicable Legal Standards

"In assessing the credibility of a claimant's testimony regarding subjective pain or the intensity of symptoms, the ALJ engages in a two-step analysis." *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) (citing *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009)). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1102 (9th Cir. 2014) (quoting *Lingenfelter*, 504 F.3d at 1036) (internal quotation marks omitted). If so, and if the ALJ does not find evidence of malingering, the ALJ must provide specific, clear and convincing reasons for rejecting a claimant's testimony regarding the severity of her symptoms. *Id*. The ALJ must identify what testimony was found not credible and explain what evidence undermines that testimony. *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001). "General findings are insufficient." *Lester*, 81 F.3d at 834.

### 3. Discussion

"After careful consideration of the evidence," the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," but found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (AR 31.) The ALJ relied on the following reasons: (1) receipt of unemployment benefits; (2) lack of objective medical evidence to support the alleged severity of symptoms; (3) inconsistent statements and conduct; and (4) drug-seeking behavior. (AR 30-31.) No malingering allegation was made, and therefore, the ALJ's reasons must be "clear and convincing."

///

## a. Reason No. 1: Receipt of Unemployment Benefits

The continued receipt of unemployment benefits casts doubt on a claimant's allegations of disability because it shows that a claimant is holding himself or herself out as being capable of work. *Ghanim v. Colvin*, 763 F.3d 1154, 1165 (9th Cir. 2014) (citing *Copeland v. Bowen*, 861 F.2d 536, 542 (9th Cir. 1988)). Here, the ALJ found that Plaintiff's credibility was damaged because she received unemployment benefits after the AOD. (AR 30.) The ALJ noted that in order to receive unemployment benefits, Plaintiff must certify that she is ready, willing, and able to work, and therefore "[h]er certification that she was able to work contradicted her claim of disability." (*Id.*)

Plaintiff contends that this reason is not clear and convincing because the record fails to establish that she held herself out as available for only full-time work, citing to *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1161-62 (9th Cir. 2007) (holding that an ALJ errs in concluding that receipt of unemployment benefits undermines a claimant's credibility where record does not establish whether claimant "held himself out as available for full-time or part-time work"). (JS 52.) The transcript of the administrative hearing contains the following exchange between the ALJ, Plaintiff, and Plaintiff's counsel:

> Q:        How long did you draw unemployment?
>
> A:        For as long as I could, until—
>
> Q:        A year and a half, two years?
>
> A:        Probably about two years. Because the other was an extension that was given during that time.
>
> Q:        Right. And it was at that time you understood that you were representing that you would accept, if offered, a full-time position for work, that you were ready, willing, and able to work?
>
> A:        No. During the time that I was—
>
> Q:        On unemployment.
>
> A:        —on unemployment I was actually having a lot of

medical problems going on at the same time too.

Q: Did you report that to the unemployment people?

A: I had to let them know I was looking for work but when I had gone to a couple interviews but those things they wanted me to do I wasn't going to be able to do the jobs that they—

Q: Right. But the point is did you understand that in order to accept money from the unemployment division, that you are representing that you are able to work?

A: Right.

Counsel: Your honor, that can be part-time work, unemployment.

Q: I asked her full time. Her response was yes, she was looking for full time.

A: I'm sorry, it was full time, part time work.

(AR 82.)

  Although Plaintiff's response that she was looking for "full time, part time work" is arguably ambiguous, the ALJ's interpretation that Plaintiff held herself out as available for full-time employment is a rational one, especially in the context of Plaintiff's counsel raising the issue regarding part-time work. Accordingly, the Court finds that Plaintiff's continued receipt of unemployment benefits after her AOD is a clear and convincing reason for discounting Plaintiff's credibility. *See Ryan*, 528 F.3d at 1198 (an ALJ's decision should be upheld "[w]here evidence is susceptible to more than one rational interpretation"); *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995) ("We will not reverse credibility determinations of an ALJ based on contradictory or ambiguous evidence.").

### b. Reason No. 2: Lack of Objective Medical Evidence

  The lack of supporting objective medical evidence cannot form the sole basis for discounting testimony, but it is a factor that the ALJ may consider in making a credibility determination. *Burch*, 400 F.3d at 681.

///

The ALJ found that Plaintiff's credibility was harmed by her "exaggeration of symptoms and the extreme functional limitations" that she described. (AR 30.) The ALJ observed that Plaintiff "alleged total incapacitation in that the claimant must lie down throughout the day and cannot leave the house," and that Plaintiff "could not even take care of her personal hygiene or perform any normal activities without assistance." (*Id.*) The ALJ found that "[t]here is no support in the record for these extreme limitations" and noted that "[m]edical signs and findings have been consistently benign." (AR 30.)

The ALJ's characterization of Plaintiff's "extreme" limitations is not entirely accurate. Plaintiff testified that she can leave the house if needed when she has someone to accompany her, but she does not leave her house by herself. (*See* AR 101, 337, 340.) Plaintiff also described having difficulty with personal care, grooming, and household tasks, but she did not allege a complete inability to take care of her hygiene or perform all activities. Plaintiff can dress herself in simple clothing and use the restroom unassisted. (AR 337.) Plaintiff explained that she tries to use her left hand for most tasks, but it tires easily. (AR 98-99, 337-40.) She stated that she can bathe, wash her hair, shave, and brush her teeth with some difficulty and exhaustion. (AR 98-99, 337.) Plaintiff tries to prepare meals and do laundry, but because repeated motions with her right hand cause her pain, Plaintiff receives help from her mother or children. (AR 337-38.)

While the ALJ found "no support in the record" for extreme limitations, the record is not completely devoid of support for Plaintiff's impairments as alleged. Dr. Wikholm diagnosed Plaintiff with anxiety disorder. (AR 773, 775, 808, 817, 950-51.) During Plaintiff's September 2011 psychiatric evaluation, Dr. DiGiaro diagnosed Plaintiff with mild bipolar I disorder, chronic PTSD, and dependent personality features, and she assessed that Plaintiff's psychosocial stressors were severe. (AR 475.) As discussed in Section IV.B.2, *infra*, the ALJ erred in giving these diagnoses little weight. When Plaintiff complained of right-side chest pain

13

that extended down her right arm in August 2009, treating physician Alexander B. Meyer, M.D., opined that "C5-6 dermatome actually would probably explain her pain pretty well." (AR 443.) In September 2009, Plaintiff complained of pain radiating from her neck into her chest and down her right arm. (AR 438.) Dr. Meyer noted that "[i]t has a good description for neuropathic pain" and suspected that it was caused by a C-5 herniated disc in Plaintiff's neck. (*Id.*) Dr. Meyer noted slightly diminished reflexes in Plaintiff's right arm, possibly due to muscle tension, and he "definitely couldn't get a triceps reflex on the right compared to the left." (*Id.*) Dr. Meyer also observed that conservative treatment had not been helpful in treating Plaintiff's pain. (*Id.*) An October 2013 MRI revealed a type 2 acromion with mild to moderate acromioclavicular joint degenerative changes, which "may be contributing to clinical impingement syndrome." (AR 1095-96.)

The ALJ erred in misstating Plaintiff's alleged limitations and, accordingly, in finding no support for these mischaracterized limitations. *See Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984) (error for an ALJ to ignore or misstate the competent evidence in the record in order to justify his conclusion). The Court finds that this reason is not a clear and convincing reason, supported by substantial evidence, to discount Plaintiff's credibility.

### c. Reason No. 3: Inconsistent Statements and Conduct

As part of the credibility determination, the ALJ may consider inconsistencies between the claimant's testimony and his other statements, conduct, and daily activities. *See Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997); *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001). Inconsistencies between symptom allegations and daily activities may act as a clear and convincing reason to discount a claimant's credibility. *See Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008); *Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991), but a claimant need not be utterly incapacitated to obtain benefits. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). "If a claimant is able to spend a substantial part

of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit a claimant's allegations." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999); *accord Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001).

In finding that Plaintiff's symptoms and limitations were "exaggerated," the ALJ noted that Plaintiff "acknowledged to Dr. Singleton that she could vacuum, wash dishes, and perform light household chores." (AR 30.) This does not detract from her overall credibility, as the record does not show that this consumed a substantial part of Plaintiff's day. In fact, in Plaintiff's Function Report, she states that household chores take "hours" to complete. (AR 338.) Further, the mere ability to perform some tasks is not necessarily indicative of an ability to perform work activities because "many home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication." *Fair*, 885 F.2d at 603; *see also Molina*, 674 F.3d at 1112-13 (the ALJ may discredit a claimant who "participat[es] in everyday activities indicating capacities that are transferable to a work setting"). The critical difference between such activities "and activities in a full-time job are that a person has more flexibility in scheduling the former . . . , can get help from other persons . . . , and is not held to a minimum standard of performance, as she would be by an employer." *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) (cited with approval in *Garrison v. Colvin*, 759 F.3d 995, 1016 (9th Cir. 2014)). Indeed, Plaintiff stated that she needs someone to assist her, and her mother and children do most things for her. (AR 338.) Plaintiff also repeatedly stated that when she does attempt tasks, she tries to use her left hand. (*See* AR 337-38.)

The ALJ also noted that during the examination with Dr. Singleton, Plaintiff "moved about actively" and was able to walk around the room, sit comfortably without difficulty, get on and off the examining table without difficulty, disrobe,

and remove the sling from her right arm. (*Id.*) These observations are not inconsistent with Plaintiff's alleged limitations. Plaintiff explained that she can dress herself with simple clothing that pulls on easily and does not have buttons, zippers, or small clasps. (AR 99, 337.) Plaintiff testified that she feels pain when sitting after 20 or 30 minutes (AR 101), but there is no indication of the length of the examination. Plaintiff also indicated that she could walk short distances (*see* AR 101-02 (about 10 minutes), AR 341 ("1 block")), which is consistent with Dr. Singleton's observation that Plaintiff "was able to walk to the examination room without any assistance" (AR 468).

The Court finds that this reason is not a clear and convincing reason, supported by substantial evidence, to discount Plaintiff's credibility.

### d. Reason No. 4: Drug-Seeking Behavior

An ALJ's finding that a claimant has engaged in drug-seeking behavior is a clear and convincing reason for rejecting symptom testimony. *See Edlund v. Massanari*, 253 F.3d 1152, 1157 (9th Cir. 2001), *as amended on reh'g* (Aug. 9, 2001).

The ALJ noted "numerous reports in the record" in which Plaintiff requested narcotic pain relief medication despite a lack of medical findings. (AR 31.) However, Plaintiff's requests were not completely unsupported by medical findings at Westside Family Practice. (*See* AR 425-45.) On March 5, 2010, Plaintiff passed a small kidney stone, and her urinalysis tested positive for nitrites, leukocytes, and a large amount of blood. (AR 432.) She requested and was given a shot of Femerol and Phenergan. (*Id.*) Plaintiff presented her kidney stone for analysis on March 8, 2010, and she received another pain shot. (AR 431.) At a follow-up visit on March 10, 2010, Dr. Meyer noted a "presumed infection" and considered referring Plaintiff to another doctor or the emergency room. (*Id.*) Plaintiff again received a pain shot. (*Id.*) The next day, Plaintiff returned with lower abdominal and pelvic pain, and another injection of Demerol and Phenergan was given. (AR 430.) On

16

March 15 and 16, 2010, Plaintiff again received Demerol and Phenergan for a migraine. (*Id.*) Plaintiff returned on March 17, 2010. (AR 429.) Although Plaintiff first requested a pain shot, she then said that the pain was not severe, so she was given a syringe of Phenergan to take home for later. (*Id.*) On March 19, 2010, Dr. Meyer suggested stopping narcotics "for fear of continuing a rebound effect" and recommended against Demerol. (AR 428.) On April 8 and 9, 2010, Plaintiff had follow-up visits after going to Urgent Care for an ankle sprain. (AR 427.) She also had blood in her urine and suspected another kidney stone, so Plaintiff was given Demerol and Phenergan "with some reluctance." (*Id.*) The ALJ noted that on April 13, 2010, Dr. Meyer gave Plaintiff a Demerol injection for kidney pain, but "would not prescribe any other medication until she had an abdominal CT scan." (AR 31.) In fact, Dr. Meyer ordered a CT scan "for stone protocol" and stated that "[f]urther treatment will obviously depend on the CT results." (AR 426.) Dr. Meyer also observed, "I haven't written her a prescription for narcotics, and I don't think she has gotten very much, if any, from other doctors either." (*Id.*) About a week later, the scan results were negative and Dr. Meyer noted that Plaintiff had received Phenergan from urgent care, but "[s]he is not taking any narcotic pills." (*Id.*) In May 2010, Plaintiff returned with blood in her urine and possible kidney stones and a urinary tract infection. (AR 425.) Dr. Meyer "reluctantly agreed" to give her a pain shot and warned against going to urgent care for pain shots. (*Id.*)

The ALJ also observed that "Dr. Singleton noted the claimant was taking numerous pain relief medications despite the fact that x-rays of the right foot and right shoulder were negative." (AR 31.) However, Dr. Singleton's summary of Plaintiff's records does not support a finding that Plaintiff was using these medications despite normal medical findings. In his evaluative report, Dr. Singleton stated:

> Review of her records revealed the need for multiple pain medications in May 2010. She had a prescription for Xanax, alprazolam, Vicodin, Percocet, and lorazepam at one visit for renewal. In addition, she had a right foot x-ray done, which showed no evidence of a fracture or injury, right clavicle, again revealed no acute fracture or dislocation seen. This was in 2009.

(AR 467.) The ALJ's mischaracterization of this part of Dr. Singleton's report was in error. *See Gallant*, 753 F.2d at 1456 (9th Cir. 1984).

Finally, the ALJ noted Plaintiff's "huge number of medical appointments" at Centers for Family Health between 2008 and 2011. (AR 31; *see* AR 579-726.) Plaintiff frequently complained of migraines and kidney stone pain and requested pain medication. The ALJ noted that "[t]he possibility of drug-seeking behavior was raised in these records" and that Plaintiff "appears to be motivated by a narcotic pain medication dependence." (AR 31.) In August 2009, Plaintiff requested Demerol for kidney stones and declined the doctor's recommendation of Percocet. (AR 700.) Treatment notes state that the doctor "will not give injectables" and that Plaintiff left the clinic upset. (*Id.*) In July 2010, Demerol addiction was discussed, and Plaintiff was given an educational handout. (AR 660.) In September 2010, it was noted that Plaintiff "knows we can't keep giving Demerol every other day – should be discussed." (AR 631.) Plaintiff was not taking narcotics in October 2010 (AR 619) and did not want Demerol shots during an early November 2010 visit (AR 615). However, on November 21, 2010, treatment notes show that Plaintiff "requested narcotics but there was no clear indication for pain meds at this time." (AR 609.)

Although some records suggest an objective medical basis for Plaintiff's pursuit of pain relief, the evidence can rationally support the ALJ's finding of drug-seeking behavior. Accordingly, the Court must uphold her interpretation of the evidence. *See Ryan*, 528 F.3d at 1198; *Robbins*, 466 F.3d at 882.

///

### 4. Conclusion

Because the Court found that two of the ALJ's reasons for discounting Plaintiff's credibility are not clear and convincing, the Court must decide whether the ALJ's reliance on those reasons was harmless error. *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008). The relevant inquiry "is not whether the ALJ would have made a different decision absent any error," but whether the ALJ's decision is still "legally valid, despite such error." *Id.* The "remaining reasoning *and ultimate credibility determination* [must be] . . . supported by substantial evidence in the record." *Id.* (emphasis in original) (citing *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2004)). Here, given the discussion above concerning Plaintiff's receipt of unemployment benefits and drug-seeking behavior, the Court concludes the ALJ's credibility finding is legally valid and supported by substantial evidence.

### B.    The ALJ Did Not Properly Assess The Medical Opinion Evidence

Plaintiff argues that the ALJ improperly rejected the opinions of five doctors. (JS 4.) The Commissioner argues that the ALJ properly evaluated all of the medical opinion evidence. (JS 15-16.)

### 1.    Applicable Legal Standards

Courts give varying degrees of deference to medical opinions based on the provider: (1) treating physicians who examine and treat; (2) examining physicians who examine, but do not treat; and (3) non-examining physicians who do not examine or treat. *Valentine v. Comm'r, Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009). Most often, the opinion of a treating physician is given greater weight than the opinion of a non-treating physician, and the opinion of an examining physician is given greater weight than the opinion of a non-examining physician. *See Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014).

The ALJ must provide "clear and convincing" reasons to reject the ultimate conclusions of a treating or examining physician. *Embrey v. Bowen*, 849 F.2d 418,

422 (9th Cir. 1988); *Lester*, 81 F.3d at 830-31. When a treating or examining physician's opinion is contradicted by another opinion, the ALJ may reject it only by providing specific and legitimate reasons supported by substantial evidence in the record. *Orn*, 495 F.3d at 633; *Lester*, 81 F.3d at 830; *Carmickle*, 533 F.3d at 1164. A non-examining physician's opinion can constitute substantial evidence if it is supported by other evidence in the record and is consistent with it. *Morgan*, 169 F.3d at 600. "An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting evidence, stating his interpretation thereof, and making findings.'" *Garrison*, 759 F.3d at 1012 (citation omitted).

### 2. Discussion

#### a. Treating Physician Gary Wikholm, M.D.

Dr. Wikholm completed several written statements. In October 2011 and April 2012, he provided identical responses on half-page check-box forms, indicating that Plaintiff had a chronic medical condition and was unable to work. (AR 782.) In June 2012, Dr. Wikholm completed a one-page form in which he indicated that Plaintiff could lift less than 10 pounds for a half hour per day, could stand or walk for one hour per 8-hour workday, must alternate sitting and standing, and had moderate limitations in using her upper extremities. (AR 784.) Dr. Wikholm also completed an RFC Questionnaire in April 2013. (AR 820-24.) He noted that emotional factors, including Plaintiff's depression, anxiety, and personality disorder, affect the severity of Plaintiff's symptoms and limitations. (AR 821.) Dr. Wikholm indicated that Plaintiff's symptoms would frequently interfere with her attention and concentration, and he found that she was incapable of even low-stress work. (*Id.*) Dr. Wikholm stated that Plaintiff could sit or stand for 15 minutes at a time, for a total of less than 2 hours per 8-hour workday. (AR 821-22.) He anticipated that Plaintiff would need to take 15-minute unscheduled breaks every one or two hours and would be absent from work more than four days

per month. (AR 822-23.) Dr. Wikholm limited Plaintiff to occasionally lifting or carrying less than 10 pounds, rarely looking down, and occasionally moving her head in other directions. (AR 823.) He imposed postural limitations and significant manipulation limitations, noting that Plaintiff can never use her right hand to grasp or twist, and can perform fine manipulations with her right fingers and reach with her right arm only 10% of the time. (*Id.*)

The ALJ gave "little probative weight" to the single-page forms, finding them "totally unsupported by a diagnosis, objective findings, or discussion of treatment." (AR 25, 30.) The ALJ also noted a lack of objective findings or discussion of treatment in the RFC Questionnaire. (*Id.*) This is a specific and legitimate reason for the ALJ to discount Dr. Wikholm's opinion. *See Magallanes*, 881 F.2d at 751 (an ALJ may disregard a treating physician's opinion that is brief, conclusory, and lacks clinical findings); *Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996) ("The ALJ, however, permissibly rejected [psychological evaluations] because they were check-off reports that did not contain any explanation of the bases of their conclusions."). Further, the ALJ noted that Dr. Wikholm "appears to be a sympathetic doctor who bases his treatment on subjective complaints without objective medical support." (AR 31.) The ALJ observed that his diagnostic impressions appeared to be "a reiteration of the subjective complaints voiced by the claimant." (*Id.*) An opinion that is based on a claimant's discredited subjective complaints may be rejected. *See Tommasetti*, 533 F.3d at 1041; *Tonapetyan*, 242 F.3d at 1149; *Morgan*, 169 F.3d at 602; *Fair*, 885 F.2d at 605. In sum, the ALJ gave specific and legitimate reasons for rejecting Dr. Wikholm's imposed limitations.

Dr. Wikholm's opinions also state a diagnosis of chronic anxiety disorder. (AR 784, 820; *see* AR 773, 775, 808, 817, 950-51.) The ALJ found that this diagnosis was of "little probative weight" because Dr. Wikholm is not a psychiatrist or psychologist. (AR 25.) However, as a treating physician who prescribed

psychotropic medication (*see* AR 808), Dr. Wikholm's opinion cannot be disregarded on that basis. *See Lester*, 81 F.3d at 833 (the opinion of a treating physician who provides treatment for a claimant's psychiatric impairment "constitutes 'competent psychiatric evidence' and may not be discredited on the ground that he is not a board certified psychiatrist"). This portion of Dr. Wikholm's opinion was improperly rejected.

**b.     Examining Psychologist Deborah DiGiaro, Ph.D.**

Dr. DiGiaro performed a comprehensive psychiatric evaluation of Plaintiff in September 2011. During this evaluation, Plaintiff complained of anxiety and depression, and she reported a history of childhood molestation, abusive parents, abusive relationships, and a recent rape. (AR 472.) Plaintiff stated that she went to a psychiatrist once in 2010, and she also received counseling at Cal Works about twice a week for two months. (AR 473.) Plaintiff's primary care doctor prescribed Xanax or Ativan after she reported being depressed and anxious, but she has never taken an antidepressant or mood stabilizer. (*Id.*) Dr. DiGiaro observed that Plaintiff's affect was tearful and her mood was depressed. (AR 474.)

Dr. DiGiaro diagnosed mild bipolar I disorder, chronic PTSD, dependent personality features, and severe psychosocial stressors. (AR 475.) She found mild impairment in Plaintiff's ability to perform detailed and complex tasks, maintain regular attendance in the workplace, and complete a normal workday or workweek without interruptions from a psychiatric condition. (AR 476.) Dr. DiGiaro also found that Plaintiff's ability to deal with stress in a competitive workplace environment was moderately impaired. (*Id.*)

The ALJ gave Dr. DiGiaro's assessed limitations "little probative weight" because "there is no mental health evidence to support any functional limitations due to a mental disorder." (AR 22; *see* AR 31.) However, as a psychologist, Dr. DiGiaro can provide a diagnosis that serves as objective medical evidence. *See Savannah v. Astrue*, 252 F. App'x 783, 785 (9th Cir. 2007) ("Diagnosis by a

22

medical expert constitutes objective medical evidence of an impairment."); *see also Rodriguez v. Bowen*, 876 F.2d 759, 762 (9th Cir. 1989) ("Disability may be proved by medically-acceptable clinical diagnoses, as well as by objective laboratory findings." (quoting *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975))).

In finding no support for Dr. DiGiaro's opinion, the ALJ also noted that Plaintiff has not received significant mental health care. (AR 22, 24, 31.) However, the Ninth Circuit has criticized the practice of discrediting evidence based on a lack of treatment "both because mental illness is notoriously underreported and because it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." *Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1299-300 (9th Cir. 1999) (internal quotation marks omitted) (citing *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996)). At her evaluation, Plaintiff stated that she "has wanted to go to treatment," but she did not seek any treatment for herself because her last husband was against it. (AR 473.) At the hearing, Plaintiff explained that a conflict of interest developed when Plaintiff's daughter had to begin seeing the same therapist that Plaintiff had been seeing. (AR 104.) The ALJ further erred by relying on Plaintiff's limited mental health treatment without considering her explanation for the limited treatment. *See Marquez v. Astrue*, No. EDCV 09-1921-E, 2010 WL 1709204, at *2 (C.D. Cal. Apr. 27, 2010) ("Given the uncertainty surrounding the extent to which these errors [of relying on irregular treatment without considering the claimant's explanation] may have affected the ALJ's decision, including the ALJ's determinations to reject Plaintiff's credibility and to discount [a treating physician]'s opinion, the Court is unable to conclude that the errors were harmless.").

The Court finds that the ALJ failed to provide clear and convincing reasons to reject the opinion of Dr. DiGiaro.

///

### c.     Examining Physician Michael Singleton, M.D.

Dr. Singleton completed a comprehensive internal medicine evaluation of Plaintiff in September 2011.  At the examination, Plaintiff complained of pain in her right neck, right shoulder, and right hand.  (AR 467.)  Dr. Singleton noted that Plaintiff had a prescription for Xanax, alprazolam, Vicodin, Percocet, and lorazepam in May 2010.  (AR 468.)  He also noted no evidence of fracture or injury in Plaintiff's 2009 x-rays of her right foot, right clavicle, and right shoulder.  (*Id.*)  Plaintiff reported that her right hand pain made it difficult to write, but Dr. Singleton noted that "she is able to write for three hours, as she states in her report." (*Id.*)  Plaintiff told Dr. Singleton that she helped with vacuuming, dishes, and light housework.    (*Id.*)    Dr. Singleton observed that Plaintiff could walk to the examination room without assistance, sat comfortably during the exam, was able to get on and off the examination table, removed the sling from her arm, and could take off her shoes and put them back on, although with some difficulty.  (AR 468-69.)  Plaintiff's right hand and right radial side of her upper arm had dermatomal abnormalities involving C8 dermatome.    (AR 469.)    Dr. Singleton observed neuropathy involving the C3-C8 dermatomes on the right upper extremity.  (AR 470.)  Compared to her left shoulder, Plaintiff's right shoulder demonstrated 50 degrees less forward flexation, 20 degrees less extension, 50 degrees less abduction, 20 degrees less adduction, 20 degrees less internal rotation, and the same external rotation.  (*Id.*)  Plaintiff's upper extremity and grip strength was 4/5 on the right and 5/5 on the left.  (*Id.*)  Dr. Singleton found that Plaintiff could lift or carry 50 pounds occasionally and 25 pounds frequently, "involving the left hand mainly."  (AR 471.)    He also limited Plaintiff to occasional climbing, reaching, handling, fingering, and feeling involving the right hand, with no limitations involving the left hand.  (*Id.*)

The ALJ found "no objective basis" in the record for these hand limitations.  (AR 29).  The ALJ observed that Plaintiff admitted to Dr. Singleton that she could

write with her right hand for three hours.  (AR 29.)  In fact, Dr. Singleton noted that Plaintiff "is able to write for three hours, as she states in her report."  (AR 468.)  In her Function Report, which Dr. Singleton reviewed (*see* AR 467), Plaintiff stated, "Filling out this form took me 3 hours.  Writing is very difficult for me. . . . I'm embarrassed to write and my writing. . . . I decided to fill out this form myself to show how bad my writing gets.  My hand (right) is in a lot of pain and cramped." (AR 343.)   Plaintiff's Report contains several other statements attesting to the difficulty that she had in completing the form.  (*See* AR 336 ("I also have a difficult time writing.  I apologize if this becomes difficult to read."), AR 337 ("Writing is painful.  I'm in a lot of pain filling out this form.").)  Dr. Singleton's observation that Plaintiff "is able to write for three hours" does not accurately reflect Plaintiff's assertion.   In turn, the ALJ mischaracterized Dr. Singleton's report, noting that during the examination, Plaintiff "admitted she could write with her right hand for three hours."  (AR 24, 29.)  The ALJ erred in relying on this reason.  *See Reddick*, 157 F.3d at 722-23 (finding that the ALJ's conclusions were unsupported by the record as a whole when "[i]n essence, the ALJ developed his evidentiary basis by not fully accounting for the context of materials or all parts of the testimony and reports," and his "paraphrasing of record material is not entirely accurate regarding the content or tone of the record").

The ALJ also noted that Plaintiff acknowledged being able to complete household tasks, and she was able to disrobe and remove her sling during the examination.  (AR 29.)  However, as previously discussed, Plaintiff explained that she can dress herself and perform simple tasks when primarily using her left hand. (*See* AR 99, 337-38.)  These activities are not inconsistent with the limitations that Dr. Singleton imposed on Plaintiff's right—but not left—arm and hand.  (*See* AR 471.)

The ALJ ultimately rejected Dr. Singleton's hand limitations and gave them "little probative weight" due to the "complete lack of medical support."  (AR 29-

30.) The ALJ stated that Plaintiff had "good range of motion" and "normal muscle strength" through the examination. (AR 24, 29.) But Dr. Singleton actually noted Plaintiff's "limited range of motion involving the right shoulder" (AR 469), "discomfort during rightward cervical motion" (AR 470), and "difficulty raising her right shoulder" (*id.*). Plaintiff's right shoulder mobility and extension were notably less than that on her left shoulder, and her strength was somewhat reduced on her right side. (*Id.*) The ALJ also failed to acknowledge Dr. Singleton's findings of neuropathy and dermatomal abnormalities. (AR 469-70.) The ALJ erred in seemingly ignoring this competent evidence from Dr. Singleton's independent examination of Plaintiff. *See Tonapetyan*, 242 F.3d at 1149 ("[The examining physician]'s opinion alone constitutes substantial evidence, because it rests on his own independent examination of [the claimant].").

The Court finds that the ALJ failed to provide clear and convincing reasons to reject the opinion of Dr. Singleton.

### d. State Agency Medical Consultants Roger Fast, M.D. and H.M. Estrin, M.D.

Dr. Fast reviewed Plaintiff's medical records upon initial review of her application in October 2011. He assessed that Plaintiff could lift or carry 20 pounds occasionally and 10 pounds frequently; stand, walk, or sit for about 6 hours in a normal 8-hour workday; and occasionally push or pull due to right shoulder pain and mild weakness. (AR 136.) Dr. Fast cited Plaintiff's neck and shoulder pain in limiting Plaintiff to occasional crawling and climbing of ladders, ropes, and scaffolds. (AR 136-37.) Dr. Fast also found that Plaintiff's ability to reach, handle, finger, and feel were limited on her right side "due to neck and right shoulder pain with pain into right arm." (AR 137.) Overall, he recommended "a light RFC with manipulative restriction on the right." (*Id.*)

Dr. Estrin reviewed Plaintiff's medical records upon reconsideration of her application in May 2012. His RFC assessment was largely the same as Dr. Fast's

assessment, with slight variations in postural limitations.  (*See* AR 161-62.)  Dr. Estrin also found that Plaintiff had no limitations regarding her skin receptors' ability to feel.  (AR 163.)

The ALJ summarized both consultants' assessments of Plaintiff's limitations, but the ALJ did not assign these opinions any weight, nor did she explicitly accept or reject them.  (AR 27.)  "Where an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, [s]he errs."  *Garrison*, 759 F.3d at 1012-13 (internal citation omitted).

The Court finds that the ALJ failed to provide any legally sufficient reasons to reject the opinions of Dr. Fast and Dr. Estrin.

In sum, the Court determines that the ALJ failed to provide legally adequate reasons for rejecting the opinions, or portions of opinions, of Plaintiff's treating and examining physicians, as described above.  Further, the Court concludes that remand for further administrative proceedings is appropriate to allow the ALJ to reassess the medical opinions of these physicians.

## C.    The Court Declines To Address Plaintiff's Remaining Arguments

Having found that remand is warranted, the Court declines to address Plaintiff's remaining arguments that the ALJ improperly rejected Plaintiff's mother's testimony and improperly assessed Plaintiff's RFC and her ability to perform past work.  *See Hiler v. Astrue*, 687 F.3d 1208, 1212 (9th Cir. 2012) ("Because we remand the case to the ALJ for the reasons stated, we decline to reach [plaintiff's] alternative ground for remand."); *see also Augustine ex rel. Ramirez v. Astrue*, 536 F. Supp. 2d 1147, 1153 n.7 (C.D. Cal. 2008) ("[The] Court need not address the other claims plaintiff raises, none of which would provide plaintiff with any further relief than granted, and all of which can be addressed on remand.").

## D.    Remand For Further Administrative Proceedings

Because further administrative review could remedy the ALJ's errors, remand for further administrative proceedings, rather than an award of benefits, is

warranted here. *See Brown-Hunter v. Colvin*, 806 F.3d 487, 495 (9th Cir. 2015) (remanding for an award of benefits is appropriate in rare circumstances). Before ordering remand for an award of benefits, three requirements must be met: (1) the Court must conclude that the ALJ failed to provide legally sufficient reasons for rejecting evidence; (2) the Court must conclude that the record has been fully developed and further administrative proceedings would serve no useful purpose; and (3) the Court must conclude that if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand. *Id.* (citations omitted). Even if all three requirements are met, the Court retains flexibility to remand for further proceedings "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Id.* (citation omitted).

Here, remand for further administrative proceedings is appropriate. The Court finds that the ALJ failed to appropriately weigh and consider the medical opinion evidence of record.

On remand, the ALJ shall reassess the opinions of Plaintiff's treating and examining physicians and other sources, and provide legally adequate reasons for any portion of an opinion that the ALJ discounts or rejects. The ALJ shall then reassess Plaintiff's RFC and proceed through step four and step five, if necessary, to determine what work, if any, Plaintiff is capable of performing.

///
///
///
///
///
///
///
///

## V. CONCLUSION

IT IS ORDERED that Judgment shall be entered REVERSING the decision of the Commissioner denying benefits, and REMANDING the matter for further proceedings consistent with this Order.

IT IS FURTHER ORDERED that the Clerk of the Court serve copies of this Order and the Judgment on counsel for both parties.

DATED: January 26, 2018

_____
ROZELLA A. OLIVER
UNITED STATES MAGISTRATE JUDGE

**NOTICE**

**THIS DECISION IS NOT INTENDED FOR PUBLICATION IN WESTLAW, LEXIS/NEXIS, OR ANY OTHER LEGAL DATABASE.**